UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| SIDNEY HILLMAN HEALTH CENTER OF ROCHESTER and TEAMSTERS HEALTH SERVICES AND INSURANCE PLAN LOCAL 404, on behalf of themselves and all others similarly situated, | ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | No. 13 C 5865 |
| | ) | Judge Sara L. Ellis |
| ABBOTT LABORATORIES and ABBVIE INC., | ) ) ) | |
| Defendants. | ) | |

**OPINION AND ORDER**

Sidney Hillman Health Center of Rochester ("Hillman") and Teamsters Health Services and Insurance Plan Local 404 ("Local 404," and collectively with Hillman, the "Funds") are multi-employer benefit plans and health services funds that provide health benefits, including prescription drug coverage, to their members. The Funds seek to represent a nationwide class of such third-party purchasers or third-party payors ("TPPs") who from 1998 to 2012 reimbursed and paid all or some of the purchase price for Depakote, a drug developed and initially marketed by Abbott Laboratories and later by AbbVie, Inc. (collectively, "Abbott"), for indications not approved by the Food and Drug Administration (the "FDA").[1] The Funds also seek to represent subclasses of TPPs in New York and Massachusetts. The Funds bring claims for violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(c), conspiracy

---

[1] In 2012, Abbott Laboratories split into two separate companies, Abbott Laboratories, focused on the development and sale of medical products, and AbbVie, Inc., focused on the development and sale of pharmaceuticals. AbbVie, Inc. currently sells and markets Depakote in the United States, while Abbott Laboratories does so outside the United States. The Court will not differentiate between the two in this Opinion and Order.

1

to violate RICO, 18 U.S.C. § 1962(d), violation of the New York deceptive business practices act, N.Y. Gen. Bus. Law. § 349, and unjust enrichment under New York and Massachusetts law.[2] Abbott has moved to dismiss the amended class action complaint. Because the Funds have not adequately alleged proximate cause under RICO, the Court dismisses the RICO claims. With the dismissal of the federal claims, the Court declines to address the state law claims, deferring consideration of Abbott's arguments on these issues until the Funds have adequately alleged a basis for the Court's subject matter jurisdiction.

## BACKGROUND[3]

Since 1983, the FDA has approved Depakote (divalproex sodium), which is sold and marketed by Abbott, for the treatment of epileptic seizures, acute manic or mixed episodes associated with bipolar disorder, certain absence seizures for adults and children over ten years old, and adult migraine prevention and prophylaxis. The FDA has not approved Depakote for the treatment of dementia, including agitation associated with dementia, bipolar depression, schizophrenia, attention deficit hyperactivity disorder ("ADHD"), narcotic drug withdrawal, or any other uses.

Nonetheless, Abbott has marketed Depakote for such unapproved "off-label" uses. To do so, it has used intermediary marketing firms, allegedly independent entities, paid physician

---

[2] The Court previously dismissed the Funds' complaint on statute of limitations grounds, Doc. 67, but the Seventh Circuit reversed that decision and remanded the case for further proceedings, *Sidney Hillman Health Ctr. of Rochester v. Abbott Labs., Inc.*, 782 F.3d 922 (7th Cir. 2015). The Funds then filed the amended class action complaint currently before the Court.

[3] The facts in the background section are taken from the Funds' amended class action complaint and are presumed true for the purpose of resolving Abbott's motion to dismiss. *See Virnich v. Vorwald*, 664 F.3d 206, 212 (7th Cir. 2011); *Local 15, Int'l Bhd. of Elec. Workers, AFL-CIO v. Exelon Corp.*, 495 F.3d 779, 782 (7th Cir. 2007). Both parties have submitted declarations and exhibits in connection with their motions to dismiss. Although some of these documents are mentioned in the amended class action complaint or the Court could take judicial notice of them, the Court has not considered these documents in deciding the motion to dismiss, relying instead only on the allegations contained in the amended class action complaint.

spokespeople, as well as its own internal sales divisions. These efforts resulted in dramatically increased sales of Depakote, reaching $1.5 billion in 2007.

Abbott established and controlled three enterprises to promote off-label Depakote uses. First is what the Funds have termed the "CENE Enterprise," comprised of Abbott, associated physicians, the Council for Excellence in Neuroscience Education ("CENE"), and ACCESS Medical Group ("ACCESS"). CENE—a purportedly independent continuing education medical group with undisclosed ties to Abbott—disseminated materials and sponsored webinars and meetings on off-label Depakote uses. CENE also retained "faculty" and "council" physician members to promote Depakote for off-label uses. ACCESS aided CENE by creating continuing education materials, including slide show presentations for use by doctors in Abbott's speakers' bureau. The second—the so-called "PharmaCare Enterprise"—included Abbott, its sales representatives, and PharmaCare Strategies, Inc. ("PharmaCare Strategies"), a market development firm that trained Abbott employees to successfully promote Depakote for off-label uses. PharmaCare Strategies conducted its training off-site rather than at Abbott's headquarters. The third enterprise, the "ABcomm Enterprise," funneled kickbacks to physicians to increase Depakote prescriptions. The ABcomm Enterprise included physicians and other medical professionals, Abbott, and ABcomm, Inc. ("ABcomm"), a medical continuing education provider that created training materials and provided live activities. Abbott controlled and participated in each of these enterprises with the goal of increasing the amount of off-label Depakote prescriptions purchased by the TPPs.

Through these three enterprises, Abbott sponsored dinners and other programs where a physician would speak on off-label Depakote uses. Abbott directly or indirectly compensated the speaker, also paying for the meals of those physicians attending the dinners. Abbott funded

3

physicians' studies of Depakote, which served as a backdoor way of increasing Depakote prescriptions. Abbott also funded the development of clinical practice guidelines for Depakote that mandated its use as a first-line of defense for dementia and long-term agitation and sundown syndrome in patients suffering from dementia. The guidelines did not disclose Abbott's financial support, instead purporting to be independent. Similarly, Abbott issued supplements to medical journals disguised as peer-written articles free from pharmaceutical manufacturer influence that promoted Depakote's use for off-label indications.

In addition to working with these outside entities and physicians to promote off-label uses of Depakote, Abbott also had internal mechanisms in place to drive such sales. This included providing incentive packages to sales representatives based on their success in marketing Depakote. Abbott promoted standardized messaging among its sales representatives, providing them with scripts on how to sell physicians on prescribing Depakote for off-label uses. Abbott then had monthly contests for each district sales area, rewarding sales representatives for their delivery of the scripted messages. To optimize its targets, Abbott accessed and analyzed prescription data from Health Market Science, Inc. Abbott encouraged its sales representatives to discuss the lower cost of Depakote and its higher likelihood of reimbursement when compared to other medications such as Lamictal, an anticonvulsant used for maintenance treatment of bipolar I disorder (for which Depakote is not indicated). Abbott also instructed sales representatives to encourage physicians to use rapid loading or increased doses of Depakote in their patients, despite warning labels and other dosing instructions. Abbott blurred the lines between bipolar mania and agitation associated with dementia to make its sales appear legitimate, used data that did not relate directly to Depakote, and promoted Depakote directly to patients and caregivers at support group meetings. But because Abbott wanted to conceal its off-

4

label marketing, it instructed its sales representatives not to place their call notes—i.e., their summaries of sales calls with physicians—concerning off-label uses of Depakote into its computer system and instructed them to indicate discussions of on-label diagnoses instead.

Abbott marketed Depakote for off-label uses despite having no reliable evidence of its safety or efficacy for the treatment of these off-label conditions and, in some cases, having evidence that it was actually ineffective or unsafe for those conditions. For example, a study suspended in March 1999 for safety reasons "failed to show that Depakote was effective in treating the signs and symptoms of mania in elderly dementia patients." Doc. 92 ¶ 60. Abbott also started but did not complete another clinical trial to evaluate Depakote's safety and efficacy in treating agitation in elderly dementia patients in 2000 and received reports in May 2003 and December 2004 that Depakote made no meaningful difference in the treatment of elderly dementia patients when compared to a placebo group.

Nonetheless, Abbott persisted with its off-label marketing efforts. According to FDA projections, between March 2008 and February 2009, for retail outpatient Depakote prescriptions for patients over 61 years old, approximately 11% were associated with a schizophrenia diagnosis, 6.1% with a dementia diagnosis, and 5.4% with a depression diagnosis. Over the same time period, more than 12% of retail outpatient Depakote prescriptions for patients 17 years or older were associated with a schizophrenia diagnosis, nearly 17% of retail outpatient Depakote prescriptions for patients between 12 and 16 years old were associated with an ADHD diagnosis, and 25% of retail outpatient Depakote prescriptions for patients between 17 and 20 were associated with conduct disturbance or impulse control disorder diagnoses. From March 2002 to February 2009, approximately 11.3% of retail outpatient Depakote prescriptions for patients over 61 years old were associated with dementia, schizophrenia, or depression. During

5

this same time period, nearly 9% of retail outpatient Depakote prescriptions written for patients 17 years or older were for schizophrenia diagnoses.

Between 2007 and 2010, however, four sealed *qui tam* actions were filed against Abbott pursuant to the False Claims Act, 31 U.S.C. § 3730(b), asserting illegal marketing of Depakote for non-FDA approved uses. On February 1, 2011, the *qui tam* actions were unsealed as the United States and fifteen state governments intervened. Another state intervened two months later. After the consolidation of those actions, on May 7, 2012, Abbott agreed to pay $1.6 billion to resolve the criminal and civil claims against it.

Hillman is a multi-employer employee welfare benefit plan providing medical benefits to employees and retirees affiliated with the Rochester, New York Regional Joint Board of Workers United. Hillman paid or reimbursed its beneficiaries' use of Depakote, including Depakote prescribed by a nursing home medical director and other geriatricians whose patients were primarily over 60 years old and may have resided in nursing homes. Local 404 is a health services fund based in Springfield, Massachusetts, with over 1,000 beneficiaries. It paid tens of thousands of dollars for its beneficiaries' Depakote prescriptions between 1998 and 2012.

**LEGAL STANDARD**

A motion to dismiss under Rule 12(b)(6) challenges the sufficiency of the complaint, not its merits. Fed. R. Civ. P. 12(b)(6); *Gibson v. City of Chicago*, 910 F.2d 1510, 1520 (7th Cir. 1990). In considering a Rule 12(b)(6) motion to dismiss, the Court accepts as true all well-pleaded facts in the plaintiff's complaint and draws all reasonable inferences from those facts in the plaintiff's favor. *AnchorBank, FSB v. Hofer*, 649 F.3d 610, 614 (7th Cir. 2011). To survive a Rule 12(b)(6) motion, the complaint must not only provide the defendant with fair notice of a claim's basis but must also be facially plausible. *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct.

6

1937, 173 L. Ed. 2d 868 (2009); *see also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

Rule 9(b) requires a party alleging fraud to "state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b). This "ordinarily requires describing the 'who, what, when, where, and how' of the fraud, although the exact level of particularity that is required will necessarily differ based on the facts of the case." *AnchorBank*, 649 F.3d at 615 (citation omitted). Rule 9(b) applies to "all averments of fraud, not claims of fraud." *Borsellino v. Goldman Sachs Grp., Inc.*, 477 F.3d 502, 507 (7th Cir. 2007). "A claim that 'sounds in fraud'— in other words, one that is premised upon a course of fraudulent conduct—can implicate Rule 9(b)'s heightened pleading requirements." *Id.* This includes fraud allegations in civil RICO complaints. *Slaney v. The Int'l Amateur Athletic Fed'n*, 244 F.3d 580, 597 (7th Cir. 2001).

## ANALYSIS

**I.   RICO Claims**

The Funds assert that Abbott violated 18 U.S.C. § 1962(c) by conducting the affairs of the CENE Enterprise, the PharmaCare Enterprise, and the ABcomm Enterprise through patterns of racketeering activity. To state a claim under § 1962(c), the Funds must demonstrate they have standing, as required by statute, and allege "(1) conduct (2) of an enterprise (3) through a pattern of racketeering activity." *DeGuelle v. Camilli*, 664 F.3d 192, 198–99 (7th Cir. 2011) (citation omitted). Additionally, to recover under RICO, the Funds must allege that their injuries arise "by reason of" a violation of § 1962, requiring both "but for" and proximate causation. 18 U.S.C. § 1964(c); *DeGuelle*, 664 F.3d at 199. Abbott argues that the Funds have not properly

alleged statutory standing, causation, racketeering activity on behalf of an enterprise, or the required two predicate acts of racketeering. Because the Court finds that the Funds have not adequately alleged proximate cause, it need not address Abbott's other arguments.

In determining whether the Funds have adequately alleged proximate cause, the Court considers "whether the alleged violation led directly to the plaintiff's injuries." *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 461, 126 S. Ct. 1991, 164 L. Ed. 2d 720 (2006). The "general tendency" is "not to go beyond the first step," i.e. to only allow those directly injured by a defendant's actions to recover under RICO. *Holmes v. Sec. Inv'r Prot. Corp.*, 503 U.S. 258, 271, 112 S. Ct. 1311, 117 L. Ed. 2d 532 (1992); *see also Hemi Grp., LLC v. City of N.Y., N.Y.*, 559 U.S. 1, 10, 130 S. Ct. 983, 175 L. Ed. 2d 943 (2010) (reiterating *Holmes*' instruction that causation theories that require going "beyond the first step . . . cannot meet RICO's direct relationship requirement"). "Such directness obviates the difficulty in assessing damages from indirect injuries; avoids complicated rules for apportioning damages among several injured parties with greater or lesser injuries; and provides the requisite level of deterrence for RICO tortfeasors." *RWB Servs., LLC v. Hartford Computer Grp., Inc.*, 539 F.3d 681, 688 (7th Cir. 2008); *see also Holmes*, 503 U.S. at 269 (setting forth justifications for direct relationship requirement). Requiring directness, however, does not mean that there cannot be multiple victims; "in fact, one of the hallmarks of a RICO violation is 'the occurrence of distinct injuries' affecting several victims." *RWB Servs., LLC*, 539 F.3d at 688 (quoting *Morgan v. Bank of Waukegan*, 804 F.2d 970, 975 (7th Cir. 1986)).

Courts considering TPPs' off-label RICO claims have reached differing conclusions as to whether the link between the alleged misrepresentations made by pharmaceutical company defendants and the ultimate injury suffered by TPP plaintiffs is sufficiently direct to meet

8

RICO's proximate cause requirement. Some courts have found that the chain of causation involves too many independent steps or actors. *See, e.g.*, *UFCW Local 1776 v. Eli Lilly & Co.*, 620 F.3d 121, 134 (2d Cir. 2010) (finding chain of causation too "attenuated" where TPPs did not "allege that *they* relied on Lilly's misrepresentations" but rather that Lilly directed its misrepresentations at doctors prescribing the drug at issue because "only the TPPs were in a position to negotiate the price paid for Zyprexa" and so "the only reliance that might show proximate causation with respect to price is reliance by the TPPs, not reliance by the doctors"); *United Food & Commercial Workers Cent. Penn. & Reg'l Health & Welfare Fund v. Amgen, Inc.*, 400 F. App'x 255, 257 (9th Cir. 2010) (TPPs failed to plead proximate causation linking alleged misconduct to alleged injury where it depended on "an attenuated causal chain that involved at least four independent links," including doctors' decisions to prescribe drug for off-label uses); *In re Yasmin & Yaz (Drospirenone) Mktg., Sales Practices & Prods. Liab. Litig.*, No. 3:09-CV-20071-DRH, 2010 WL 3119499, at *7 (S.D. Ill. Aug. 5, 2010) (finding that "multiple steps separate the alleged wrongful conduct . . . and the alleged injuries," with the "causal link necessarily involv[ing] the decision making process of the patient, the prescribing physician, and the third party payor").[4] Other courts have found proximate cause satisfied where the alleged misrepresentations concerning off-label uses of a drug caused TPPs to place the drug on their formularies and the TPP was the intended victim of the alleged scheme. *See In re Avandia Mktg., Sales Practices & Prod. Liab. Litig.*, 804 F.3d 633, 644–46 (3d Cir. 2015) (finding that

---

[4] Although not in the prescription drug context, the Seventh Circuit's decision in *International Brotherhood of Teamsters, Local 734 Health & Welfare Trust Fund v. Philip Morris Inc.*, 196 F.3d 818 (7th Cir. 1999), also aligns with these decisions. In *Philip Morris*, the Seventh Circuit found that the insurers sought recovery for a remote and indirect injury with a long chain of causation, as the alleged misstatements concerning the relationship between smoking and health were directed to the public in general and so affected the plaintiff insurers "(if at all) only because they may have influenced smokers." *Id.* at 825–26.

9

presence of intermediaries in causal chain did not destroy causal chain because the defendant "does not argue that a doctor's decision to prescribe Avandia or a patient's decision to take Avandia caused [the TPPs'] injuries" but rather "[t]he conduct that allegedly caused [the TPPs'] injuries is the same conduct forming the basis of the RICO scheme alleged in the complaint—the misrepresentation of the heart-related risks of taking Avandia that caused TPPs . . . to place Avandia in the formulary," representations made directly to the TPPs);[5] *In re Neurontin Mktg. & Sales Practices Litig.*, 712 F.3d 21, 37 (1st Cir. 2013) (finding proximate cause where drug manufacturer directly targeted TPP for Neurontin sales and TPP was primary and intended victim of drug manufacturer's scheme, making its injury a natural consequence of that scheme). One key distinction between the facts in these groups of cases is whether the defendant pharmaceutical companies made the alleged misrepresentations directly to the TPPs or indirectly to physicians who then prescribed the drugs that the TPPs covered. *See Med. Mut. of Ohio v. Abbvie Inc.*, --- F. Supp. 3d ----, 2016 WL 427553, at *9 & n.3 (N.D. Ill. Feb. 5, 2016) (collecting cases discussing the "significance of such allegations of direct misrepresentations with respect to the outcomes reached" on proximate causation).

The Funds argue that the distinction drawn by courts relying on direct and indirect misrepresentations is misplaced and that the proximate cause analysis should turn instead on foreseeability. *See Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 657, 128 S. Ct. 2131, 170 L. Ed. 2d 1012 (2008) (describing the plaintiffs' injury as "the direct result" of the defendants' fraud because "[i]t was a foreseeable and natural consequence" of the defendants' scheme); *BCS Servs., Inc. v. Heartwood 88, LLC*, 637 F.3d 750, 758 (7th Cir. 2011) ("Once a plaintiff presents evidence that he suffered the sort of injury that would be the expected

---

[5] The Supreme Court denied GlaxoSmithKline LLC's petition for a writ of certiorari in *Avandia* on June 6, 2016. --- S. Ct. ----, 2016 WL 740942.

consequence of the defendant's wrongful conduct, he has done enough to withstand summary judgment on the ground of absence of causation."); *In re Neurontin Mktg. & Sales Practices Litig.*, 712 F.3d 51, 58 (1st Cir. 2013) (finding sufficient evidence of proximate cause despite no direct representations to TPPs based on evidence that the alleged injury was a foreseeable and natural consequence of the defendant's scheme).[6] But *Bridge* did not change the direct relationship requirement; indeed, its mention of foreseeability arose in the context of addressing whether the alleged injury was the direct result of the claimed fraud. *Bridge*, 553 U.S. at 658. Moreover, the *Bridge* court found the justifications for the directness requirement satisfied in the circumstances before it, noting "no independent factors that account for respondents' injury, there is no risk of duplicative recoveries by plaintiffs removed at different levels of injury from the violation, and no more immediate victim is better situated to sue" because the respondents were indeed the only parties injured by the alleged misrepresentations. *Id.* at 657. And two years after *Bridge*, the Supreme Court reiterated that "in the RICO context, the focus is on the directness of the relationship between the conduct and the harm," with foreseeability not playing a role in the analysis. *Hemi Grp.*, 559 U.S. at 12 (plurality opinion noting that foreseeability test was rejected in *Anza*, that "no one has asked us to revisit *Anza*," and that "*Anza* and *Holmes* never even mention the concept of foreseeability"). Instead, only the dissent in *Hemi Group* advocated the position the Funds ask the Court to adopt. *See id.* at 25 (Breyer, J., dissenting) (arguing that the direct relationship test should "expand liability . . . *beyond* what was foreseeable, not . . . eliminate liability for what was foreseeable"); *see also Anza*, 547 U.S. at 470 (Thomas, J., concurring in part and dissenting in part) (criticizing majority for "permit[ting] a

---

[6] The Funds also cite to *United States ex rel. Brown v. Celgene Corp.*, No. CV 10-3165-GHK (SSx), 2014 WL 3605896, at *8 (C.D. Cal. July 10, 2014). But *Brown* discussed causation under the False Claims Act, not RICO, and so its adoption of the foreseeability standard and application of it to alleged misrepresentations made by a pharmaceutical company to physicians and the effect that had on reimbursement of off-label prescriptions does not apply here.

11

defendant to evade liability for harms that are not only foreseeable, but the *intended* consequences of the defendant's unlawful behavior).

Having carefully reviewed the case law and the parties' arguments concerning alleging proximate cause for prescription drug TPP RICO cases, the Court agrees that a line must be drawn to "distinguish the direct consequences in a close causal chain from more attenuated effects influenced by too many intervening causes." *Emp'r Teamsters-Local Nos. 175/505 Health & Welfare Trust Fund v. Bristol Myers Squibb Co.*, 969 F. Supp. 2d 463, 475 (S.D. W. Va. 2013). The Court finds the distinguishing characteristic to be whether the drug manufacturer directly made misrepresentations to the TPP because otherwise intervening factors—such as a physician's independent medical judgment or a patient's decisionmaking—interrupt the chain of causation:

> Where a drug manufacturer or supplier directly deceives a TPP into granting its drug favorable formulary status, the relationship between the misconduct and the harm is direct and immediate. Unlike in *Holmes* and *Anza*, the alleged misconduct (misrepresenting the safety and efficacy of a drug) is not wholly distinct from the injury (deciding to pay for the drug prescribed). Though other steps must occur for the payment to actually be made—for example, physicians' prescribing the drugs and patients' filling the prescriptions—they do not interrupt the relationship between the manufacturers' direct misrepresentations and the TPP's resulting formulary decision.

*Med. Mut. of Ohio*, 2016 WL 427553, at *13. The Court does not read the Seventh Circuit's decision in *BCS Services* to require a different result, because any intervening causes were predictable and so could essentially be discounted in the analysis. *BCS Servs., Inc.*, 637 F.3d at 757 (discussing that the only intervening "cause and effect" was "straightforward" and predictable and as a result did not "weaken the inference" of causation); *see also Lexmark Int'l, Inc. v. Static Control Components, Inc.*, --- U.S. ----, 134 S. Ct. 1377, 1394, 188 L. Ed. 2d 392 (2014) (noting "general tendency not to stretch proximate causation beyond the first step" unless

there are "unique circumstances" where causation "follow[s] more or less automatically" despite intervening causes (citations omitted) (internal quotation marks omitted)).

Here, the Funds have not alleged that Abbott made direct misrepresentations to them so as to cause them to place Depakote on their formularies or pay for Depakote when prescribed. Indeed, they do not mention anything about their prescription reimbursement process in the amended class action complaint or how they came to pay for Depakote, only conclusorily alleging that they have paid or reimbursed such prescriptions for ineffective and unsafe uses. The amended class action complaint instead focuses on allegations that Abbott and its co-conspirators made representations concerning Depakote's safety and efficacy for off-label uses to doctors, patients, and caregivers, encouraging them to prescribe or use Depakote in greater amounts. Such allegations introduce additional steps into the chain of causation. These additional intervening events between the alleged misrepresentations and the Funds' alleged overpayments for Depakote—doctors' independent medical decisions to prescribe Depakote over other medications and patients' decisions to fill those prescriptions, for example—make the causal chain too attenuated to establish the required proximate causation. *See UFCW Local 1776*, 620 F.3d at 134 (finding failure to allege that TPPs themselves relied on misrepresentations crucial to a lack of proximate cause); *Yasmin*, 2010 WL 3119499, at *2, 7 (absent allegations of direct communications to TPP, finding causal link too attenuated where it "necessarily involves the decision making process of the patient, the prescribing physician, and the third party payor"); *Sergeants Benevolent Ass'n Health & Welfare Fund v. Sanofi-Aventis U.S. LLP*, 20 F. Supp. 3d 305, 323, 327 (E.D.N.Y. 2014) (finding chain of causation "interrupted" by the prescribing decisions of physicians, which are based on such factors as "the patient's diagnosis, past and current medications being taken by the patient, the physician's (and

the patient's) experience with a particular antibiotic, and the physician's knowledge of the side effects of the antibiotics"), *aff'd*, 806 F.3d 71 (2d Cir. 2015); *Bristol Myers Squibb Co.*, 969 F. Supp. 2d at 475 ("Between Defendants' alleged misleading marketing and Plaintiffs' prescription reimbursements lies a vast array of intervening events, including the 'independent medical judgment' of doctors." (citation omitted)); *Ironworkers Local Union No. 68 v. AstraZeneca Pharm. LP*, 585 F. Supp. 2d 1339, 1344 (M.D. Fla. 2008) ("establishing that Plaintiffs' injuries were caused by Defendants' misconduct would require an inquiry into the specifics of each doctor-patient relationship implicated by the lawsuit" because doctors use "their independent medical judgment to decide whether Seroquel is the best treatment for a given patient"), *aff'd*, 634 F.3d 1352 (11th Cir. 2011). And these intervening events are not like the automatic or predictable ones in *BCS Services* that could be discounted so as to find the Funds have adequately alleged that their injury is the expected consequence of Abbott's alleged misconduct. *See Sanofi-Aventis U.S. LLP*, 20 F. Supp. 3d at 323 (distinguishing *BCS Services* on the basis that the intervening acts in *BCS Services* were "calculable" and "predictable" while those in the TPP situation could not be readily predicted because "the prescribing decisions of physicians are based on so many factors as to defy any efforts to categorically attribute them to a particular cause"); *cf. BCS Servs., Inc.*, 637 F.3d at 757–58. As a result, as currently alleged, establishing damages would require individualized inquiries into the prescribing physicians' and individual patients' decisionmaking processes, creating difficulties in assessing damages that the directness requirement was intended to prevent. *See Yasmin*, 2010 WL 3119499, at *7 ("To assess damages, the Court would have to delve into the specifics of each physician patient relationship to determine what damages were caused by Bayer's alleged fraudulent conduct, as opposed to what damages were caused by the physician's independent medical judgment. . . . Attempting to

ascertain damages in this scenario[ ] would result in the type of speculative damages analysis the direct proximate cause requirement is intended to prevent."). Thus, the Court concludes that the Funds' allegations fail to establish a direct relationship between Abbott's misrepresentations and their alleged injury.

Because the Funds have not adequately pleaded proximate causation, the Court dismisses the RICO claim. This means their RICO conspiracy claim under § 1962(d) fails as well. *See United Food & Commercial Workers Unions & Emp'rs Midwest Health Benefits Fund v. Walgreen Co.*, 719 F.3d 849, 856–57 (7th Cir. 2013).

## II. State Law Claims

The Funds also bring claims for violation of the New York Deceptive Business Practices Act, New York Gen. Bus. Law § 349, and unjust enrichment under New York and Massachusetts law. Abbott argues that these claims fail for the same reasons the RICO claims fail, namely that the Funds have not pleaded cognizable injury, materially deceptive conduct, causation, or fraud in accordance with Rule 9(b)'s pleading requirements. Additionally, it contends the Court should dismiss the unjust enrichment claims because the Funds have an adequate remedy at law. Finally, Abbott resurrects its argument that the New York claims are time-barred, despite the fact that the Seventh Circuit reinstated the Court's dismissal of the state law claims on statute of limitations grounds, binding this Court to that decision. *See Sidney Hillman Health Ctr.*, 782 F.3d at 931 ("Because the state law claims were dismissed based on similar reasoning, they are reinstated as well."); *Kovacs v. United States*, 739 F.3d 1020, 1024 (7th Cir. 2014) ("The lower court is bound, through the mandate rule, to the resolution of any points that the higher court has addressed.").

Here, the Funds have pleaded that the Court has original jurisdiction over the RICO claims pursuant to 28 U.S.C. § 1331 and supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.[7] Because the Court dismisses the claims over which it has original jurisdiction at this time, the Court declines to exercise supplemental jurisdiction over the Funds' state law claims. The Court dismisses the state law claims without prejudice and defers consideration of the Funds' arguments on these claims until the Funds have adequately alleged a basis for the Court's subject matter jurisdiction. *See* 28 U.S.C. § 1367(c); *Groce v. Eli Lilly & Co.*, 193 F.3d 496, 501 (7th Cir. 1999) ("[I]t is the well-established law of this circuit that the usual practice is to dismiss without prejudice state supplemental claims whenever all federal claims have been dismissed prior to trial.").

## CONCLUSION

For the foregoing reasons, Abbott's motion to dismiss [98] is granted. The Court dismisses the amended class action complaint without prejudice.

Dated: June 29, 2016

_____
SARA L. ELLIS
United States District Judge

---

[7] The Funds do not plead that diversity jurisdiction exists, and the Court cannot proceed on the assumption that it does. *See Downs v. IndyMac Mortg. Servs., FSB*, 560 F. App'x 589, 591 (7th Cir. 2014) (refusing to find diversity jurisdiction when it was not pleaded in the complaint).